IN THE UNITED STATES DISTRISCT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION

KEVIN HUDGENS,           §
                 PLAINTIFF,           §
                                    §
V.                                  §          CASE NO. 4:23-CV-23
                                    §
ENTERPRISE PRODUCTS        §
PARTNERS, L.P. and/or       §
ENTERPRISE PRODUCTS        §
OPERATING, LLC.             §
DEFENDANT.                 §


## PLAINTIFF KEVIN HUDGEN'S FIRST AMENDED WHSITLEBLOWER COMPLAINT



Respectfully submitted,

*/s/ Eric N. Roberson*

_____
Eric Roberson
Texas State Bar No. 00792803
ENR@Kilgorelaw.com
Kilgore & Kilgore, PLLC
3141 Hood Street, Suite 500
Dallas, TX 75219
214-379-0817 Direct
214.969.9099 Switchboard
214.379.0843 Fax

**COUNSEL FOR PLAINTIFF
KEVIN HUDGENS**

## TABLE OF CONTENTS:

I.      NATURE OF THE ACTION ................................................................1

II.     PARTIES, JURISDICTION, AND VENUE ................................. 2

III.    FACTUAL ALLEGATIONS .................................................... 5

        A.      Defendant's Record as a Serial Safety Violator
                Whose Neglect Kills Employees ........................................ 5

        B.      Plaintiff Employed as a Senior Mechanical Integrity Inspector ..................... 6

        C.      Plaintiff Reports Numerous Safety Violations and Is Told
                to Keep Quiet Because "Snitches Get Stitches" .......................... 6

        D.      Plaintiff Attempts to Stop Unsafe Work Until a Scaffolding is Erected
                and is Threatened with Physical Violence by Plant Superintendent ........... 10

        E.      Plaintiff Reports Unsafe Ventilation and Nitrogen Purging
                That Could Kill Employees if Not Corrected ..................................... 11

        F.      Plaintiff Refuses to Falsify Inspection Records ................................. 12

        G.      Plaintiff Reports Numerous Safety Violations to OSHA and is Terminated
                Eight Days Later ........................................................ 12

        H.      Defendant Falsifies OSHA Response, Blacklists
                and Harasses Plaintiff ................................................ 14

IV.     LEGAL GROUNDS ........................................................ 15

V.      REQUESTED RELIEF ........................................................ 19

VI.     JURY REQUEST ........................................................ 21

VII.    PRAYER FOR RELIEF ........................................................ 21

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION

| | | |
|---|---|---|
| KEVIN HUDGENS, | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CASE NO. 4:23-cv-23 |
| | § | |
| ENTERPRISE PRODUCTS | § | |
| PARTNERS, L.P. and/or | § | |
| ENTERPRISE PRODUCTS | § | |
| OPERATING, LLC. | § | |
| DEFENDANT. | § | |

## PLAINTIFF KEVIN HUDGEN'S FIRST AMENDED WHISTLEBLOWER COMPLAINT

To the HONORABLE JUDGE of said court, now comes Plaintiff Kevin Hudgens, by and through his counsel and files this Original Complaint under the whistleblowing provisions of the federal Pipeline Safety Improvement Act.

### I.      NATURE OF THE ACTION

1.      Plaintiff was terminated from his position as a pipeline inspector because he would not stop blowing the whistle on the many pipeline safety infractions he was documenting and that the Defendant's operations managers were ignoring. Indeed, Defendant's Orly, Texas, pipeline operations are a ticking timebomb waiting to explode and kill employees and maybe others. Plaintiff documented and explained this to Defendant, but Defendant ignored his requests to ensure that the pipeline facilities were brought up to safety minimums. Indeed, Defendant openly to Plaintiff to "be quiet" and threatened violence against him. Indeed, Defendant even tried to get Plaintiff to falsify his inspections. Because Plaintiff would not be intimidated, nor lie, nor stop telling the truth, nor allow his co-workers to be placed in danger, he was wrongly terminated just 8 days after filing OSHA safety

complaints.

2.      This is an action for wrongful termination in violation of whistleblower

provisions of the Pipeline Safety Improvement Act (PSIA)) enumerated within 42 U.S.C.

Section 60129 (A) (1) (a) and (b). The PSIA expressly protects pipeline employee

whistleblowers who engage in protected activity, including by (a) informing either their

employer or the federal government of Pipeline Safety Information or (b) refusing to violate

safety laws, regulations, or standards under the PSIA.

3.      In this case, Hudgens informed both his employer and OSHA of numerous

Pipeline Safety Information matters and also refused to falsify safety documents. Separately

or collectively, this qualifies as protected activity under the PSIA. Hudgens was promptly

terminated thereafter.

## II.      PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff Kevin Hudgens is an adult resident of Carlsbad, New Mexico, and he

is a citizen of the State of New Mexico and of the United States.

5.      Defendant Enterprise Products Partners, L.P. And/Or Enterprise Products

Operating, LLC is an employer under the PSIA, owning and operating one or more pipelines in

Texas and New Mexico, and around the nation. Pertinent to this action, Defendant owns and

operates pipelines in the Permian Basin in Fort Stockton, Texas, and in Orla, Texas. Defendant

may be served through its Registered Agent for the service of process in Texas:

CT Corporation System
1999 Bryan Street, Suite 900
Dallas, TX 77002

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 as Plaintiff

asserts a federal claim under Pipeline Safety Improvement Act (PSIA), 42 U.S.C. § 60129,

timely filed his complaint of wrongful termination under the PSIA by dual filing his

Whistleblower Discrimination Complaint with the New Mexico Occupational Health and Safety

Bureau and the Occupational Health and Safety Agency (OSHA) on September 8, 2021, well

within 180 days of his termination.

7.      This matter is currently pending in the Department of Labor's Office of

Administrative Law Judges as OALJ Matter 2023-PSI-00002. As 210 days have passed since

September 8, 2021, and the Secretary of Labor has not issued a final order on Plaintiff's

complaint. Plaintiff may file a claim under the PSIA with an appropriate United States District

Court. *See* 42 U.S.C. Section 60129 (d). This Court is an appropriate Court under the PSIA

because all or part of the protected conduct occurred within this District and Division.

8.      This Court has personal jurisdiction over the Defendant because it operates

pipelines within this Western District of Texas, including within this Division, and its

headquarters is in Houston, Texas.

9.      Pursuant to the PSIA at 49 U.S.C. §60129 (b) (3) (D), if 210 days or more have

passed since the PSIA complaint was filed with OSHA and if the Secretary of Labor has not

reached a final decision, then the employee may exercise his or her kick-out right to *de novo*

review and "may bring an original action at law or equity for de novo review in the appropriate

district court of the United States."

10.     Federal courts analyzing identical language in other OSHA enforced, federal

whistleblower law kick-out provisions have held that identical language does not create a

specific venue limit, but that venue may be found in any district court that has proper venue

under general venue provisions for district courts. *See, e.g., Gouge, Jr. v. CSX Transp., Inc.*,

Case No. 12–cv–1140–DRH, 2013 WL 3283714, *2 (S. D. Ill. June 28, 2013) (analyzing

identical kick-out language under the Federal Railway Safety Act; 49 U.S.C. §20102(d)(3));
also, *Mullen v. Norfolk Southern Ry. Co.*, Case No. 13–6348, 2014 WL 1370119, *8 (E.D. Pa.
April 8, 2014) (same). Thus, Venue in this Court is proper under 28 U.S.C. §1391 because
Plaintiff worked, among other locations, in Orla, Reeves County, Texas and Fort Stockton,
Pecos County, Texas, within this district and division and thus "a substantial part of the events
or omissions giving rise to the claim occurred" within the Western District of Texas and the
Pecos Division. Moreover, over the several other District Courts or Divisions where venue is
also appropriate, Venue is preferable in Pecos, Texas, because all of the individual witnesses
related to safety occurrences and/or that are asserted to be Cat's Paw employees, as well as
Defendant's executive and human resources professionals involved, are within the subpoena
range and power of the Court sitting in Pecos, Texas, for trial purposes.

11.    Plaintiff was terminated from his position as a pipeline facility Senior
Mechanical Integrity Inspector (Integrity Inspector) because he would not stop blowing the
whistle on the many pipeline safety infractions, he was documenting in his Safety Reports
regarding Mechanical Integrity (MI) and Defendant's operations managers were ignoring.
Indeed, Defendant's *Orla*, Texas, pipeline facility operations are a ticking timebomb waiting to
explode and kill employees and maybe others. Plaintiff documented and explained this to
Defendant, but Defendant ignored his requests to ensure that the pipeline facilities were
brought up to safety minimums. Indeed, Defendant even tried to get Plaintiff to falsely sign off
on inspection reports from a different integrity inspector. Ultimately, Plaintiff notified OSHA
of many of Defendant's safety infractions, including pipeline safety infractions under the
federal Pipeline Safety Improvement Act. Because Plaintiff would neither lie, nor stop telling

the truth about Defendant's safety issues, including its pipeline safety issues, he was wrongly terminated.

### III.   Factual Background

**A.   Defendant's Record as a Serial Safety Violator Whose Neglect Kills Employees**

12.   Defendant has a long and ignominious record as a violator of safety and environmental laws. The below items are a short list of Defendant's mal- and misfeasance.

13.   Since 2000, Defendant has paid over $25 million for regulatory violations, including over $16 million in environmental and safety fines according to an industry watchdog.

14.   Between 2006-2021., Defendant has been cited 46 times for pipeline safety violations by the federal Pipeline & Hazardous Materials Safety Administration, receiving over $2 million in fines from this agency according to the agency's public reporting.

15.   In 2021, New Mexico fined Defendant $90,000 for failure to timely report a fire at its Eddy, New Mexico, facility that illegally released 250 barrels of natural gas liquid. Defendant did not report this incident for months.

16.   In 2017, Defendant's Natural gas pipeline in Eddy County, New Mexico, ruptured, exploded, and caught fire, burning a storage facility to the ground before the fire was extinguished.

17.   In 2016, Defendant had multiple explosions and/or fires in pipelines and petroleum facilities it operated, including a pipeline in Platte County, Missouri, two offshore oil operations in the gulf, and a pipeline fire in Pascagoula, Mississippi, which caused Defendant to shut down a 225-mile pipeline.

18.   In 2011, explosions at one of Defendant's storage plants in Mont Belvieu, Texas, killed a contract worker.

19.     In 2010, a pipeline explosion killed an employee of the Defendant in Cleburne, Texas. In 2010, Defendant also paid moore than a $1million in fines for three gas spills that violated the Clean Water Act.

**B.     Plaintiff Was Employed as a Senior Mechanical Integrity Inspector**

20.     Defendant is an employer under the PSIA because it operates pipelines, including within the Permian Basin in Reeves and Pecos Counties. See 42 U.S.C. § 60129 (a)(2).

21.     Plaintiff was employed by Defendant as senior mechanical integrity inspector (Integrity Inspector) earning from April of 2018 until August of 2021. Plaintiff was a highly regarded employee, and his job duties included inspecting pipeline facilities for mechanical integrity PSM compliance revolving around safe and continued service of fixed equipment assets. In other words, Plaintiff was an Integrity Inspector for the mechanical integrity of Defendant 's pipelines. Plaintiff's career was advancing, and he had even received a safety bonus for his work. All of this came crashing down when his inspections found mechanical integrity/safety issues that Defendant decided it wanted to ignore.

22.     Pursuant to the PSIA, it is a Protected Activity to provide "information relating to any violation or alleged violation of any order, regulation, or standard under this chapter or any other Federal law relating to pipeline safety" to (1) an employer or (2) the federal government ("Pipeline Safety Information").

**C.     Plaintiff Reports Numerous Pipeline Safety Violations and Is Told to Keep Quiet Because "Snitches Get Stitches"**

23.     Plaintiff engaged in Protected Activity by providing Pipeline Safety Information under the PSIA to his employer. Plaintiff notified Defendant on many occasions of the safety violations he was finding at Defendant 's facilities, including violations covered by the PSIA at Defendant 's facilities in the Permian Basin of Texas and New Mexico.

24.     In April of 2021, Plaintiff began baseline UT inspections on injection point locations in the Orla, Texas, facilities. Plaintiff inspected trains 1, 2 and 3, because these items would fall within a 3-year inspection interval. While working these inspections, among other items, Plaintiff witnessed and documented damaged equipment, including damaged structural steel pipe supports Damaged propane compressor sides, damaged amine tower and additional process piping systems and circuits. Plaintiff believed that the suspected the damage was due to seismic activity based on the nature and type of damage and the known and documented seismic activity that had been occurring in the area.

a.      Plaintiff observed an Amine tower leaning towards the East. Plaintiff witnessed the Train III (3) propane skids leaning or sinking into the ground. Plaintiff confirmed, along with a field engineer and the plant supervisor that the tower was leaning using a level, until furthermore advanced inspections and engineering could be scheduled.

b.      Plaintiff and a co-worker named Norberto then informed the facility operations manager, Jack Chamberlin, of these leans. Chamberlain witnessed and verified Plaintiff's concern. Chamberlin went up the Amine contact tower with the level and confirmed the tower was leaning as the level was off bubble. Chamberlin took pictures and sent these pictures to the regional operations manager Darrel Arrendondo and area operations manager Roland Zamarrippa.

c.      Plaintiff reported his finding to his department manager Sean, who instructed Plaintiff to be quiet, or people would get into trouble.

d.      During this timeframe, insurance underwriters had been visiting the facility.

These insurance visits are key because if the underwriters had discovered the pipeline damage caused by the seismic activity, Defendant might have been unable to obtain insurance, and this could have caused Defendant great expense and delay to operate the pipeline safely. Accordingly, Plaintiff' observations and reports of mechanical integrity – safe operations/safety violations had to be suppressed.

e.     Plaintiff also observed welding failures that included cracks in many welds, welds cracking while in service created fugitive emissions and leaks that were both highly flammable and dangerous and causing emissions that violate the Clean Air Act.

f.     While researching the facility construction inspection reports and welding reports, Plaintiff determined that there were not any inspection activities during the fabrication / erection of the facility. The entire facility documentation library was empty. No records were to be found. Plaintiff sought the assistance of a project engineer who also determined that all of the mechanical integrity, welding, civil inspections, and related documentation could not be located.

g.     Thus, there was not anyway to determine the rebar used for the concrete nor the quality of the concrete poor. Further, the lack of construction records meant that Plaintiff could not determine if the concrete facilities and rebar mat foundation were poured in accordance with code.

h.     Plaintiff also could not determine the welding that had taken place nor where the field welds had occurred, nor if the persons performing the welding, were

even qualified welders.

i.     Plaintiff informed the MI manager, Sean, of all these errors, and again
       Plaintiff was instructed to be quiet, or someone would get into trouble.

j.     Plaintiff had a meeting with Operations Manager Roland Zamarrippa for
       coffee and expressed Plaintiff's safety concerns with Zamarrippa, who
       informed Plaintiff that "snitches get stiches." During this conversation,
       Plaintiff was informed that Roland had once worked for Sean and that Sean
       was responsible for the Quality Assurance Department that was responsible
       to ensure that all inspection had been met at the Orla, Texas facility.

k.     In the Enterprise (O&M) there is section that states that 4.0 and greater
       earthquakes, the pipeline assets, right away etc. are to be inspected. Plaintiff
       asked operations how they perform these inspections and under what report
       format. Plaintiff was told "to stay in your lane." Further, Plaintiff was
       informed by several persons that Defendant never performs seismic
       inspections.

25.    On or about May 9, 2021, Plaintiff submitted to Defendant the attached
mechanical integrity report documenting the suspected seismic damages at the Orla, Texas,
Cryogenic facility (Safety Report). This Safety Report also includes documentation of the
seismic activity in the region that is the likely cause of the damage. However, given the absence
of construction records, there remains a possibility that the damage is a result of poor-quality
construction materials or workmanship.

26.    In June of 2021, during the Monthly MI meetings with department and area
managers, Plaintiff brought up the problems discovered with my seismic inspections. Plaintiff

detailed both the issues he had discovered and the management personnel who had been notified

of these mechanical integrity – safe operations/safety issues. At these meetings, Plaintiff also

stated that the inspections had found that there were cracks in many of the welds, that welds

cracking while in service created fugitive emissions and leaks and were highly flammable and

dangerous. Again, the response of Defendant 's managers was that Plaintiff was instructed "to

keep quite."

27.     Additionally, NDE tests (Digital radiography by the Mistras group based in

Odessa, Tx) were performed on about 300 high pressure (900lb and 600lb) identified high point

vents and low point drains and we discovered that over 50% had not been fabricated / welded

correctly and this is a cracking mechanism that is industry known.

28.     It was after these June meetings when Plaintiff observed that Defendant 's

managers' attitude towards Plaintiff and his safety concerns took a marked shift. Until these

meetings, Plaintiff's concerns were noted, but both Plaintiff and his concerns were essentially

ignored. In other words, Plaintiff and his reports were considered a harmless nuisance and were

merely ignored. However, once it became clear that Plaintiff was not going to allow his safety

concerns to go uncured, the attitudes of management shifted to open hostility.

**D.     Plaintiff Attempts to Stop Unsafe Work Until a Scaffolding is Erected
and is Threatened with Physical Violence by Plant Superintendent**

29.     On August 16, 2021, Plaintiff arrived at the Chapparal, New Mexico. facility.

Plaintiff identified that COVID protocols were not being followed and that the facility lacked

safety scaffolding required by law. In discussing this scaffolding issue, Plaintiff attempted to use

his authority as a senior mechanical integrity inspector to cease operations until the proper

scaffolding was completed.

30.     However, he was prevented from doing so by the plant superintendent, Zack

Berry, who literally approached him chest-to-chest and challenged him to a fight. This altercation was immediately reported to the facilities area MI manager James Vinson, who told Plaintiff to leave the site.

31.     Later that night, Berry contacted Plaintiff, informed him that the scaffolding would be completed as required, and stated that from his perspective there were "no hard feelings."

**E.     Plaintiff Reports Unsafe Ventilation and Nitrogen Purging That Could Kill Employees if Not Corrected**

32.     In this same time frame, Plaintiff also noted the absence of proper air movers or ventilation in confined spaces, which was a company policy and industry standard safety concern that could lead to loss of life due to asphyxiation given the nature of the facility and materials gasses at the facility.

33.     In this same time frame, Plaintiff also reported that Defendant was not properly using barricades during dangerous nitrogen purges of equipment. Nitrogen is used to prevent and unstable ignition of flammable gases prior to performing internal work on fixed equipment. During this nitrogen purge, it is imperative that personnel not be allowed around areas being purged. This is a safety violation is likewise an issue that could cause injury or loss of life.

34.     Yet, despite reports of safety violations that could easily lead to the loss of life or limb, Defendant ignored Plaintiff's reports and did nothing to fix or cure the unsafe ventilation or operations make ready practices.

35.     Plaintiff also provided Defendant numerous other reports to his employer, one or more of which qualify as Protected Activity and Pipeline Safety Information under the PSIA.

36.     Defendant consistently ignored the Pipeline Safety Information that Plaintiff provided and failed to rectify, fix, or cure the numerous safety issues contained in the Pipeline

Safety Information Plaintiff had provided. This inaction caused a serious risk of harm or death.

**F.      Plaintiff Refuses to Falsify Safety Reports**

37.      Rather, Defendant asked Plaintiff to engage in illegal conduct by falsifying data, but Plaintiff refused. Specifically, Plaintiff engaged in Protected Activity under the PSIA when he refused to violate Pipeline Safety rules, regulations and/or standards in May and June 2021, by refusing to falsify pipeline inspection documents. Specifically, Plaintiff was asked to certify the Waha pipeline facility, Coyanosa, Texas – Baseline process piping system and circuit visual inspection reports. However, these reports had been created by a different inspector and Plaintiff did not have factual knowledge or other basis to certify the records. Accordingly, since it would have been illegal and a violation of the PSIA for Plaintiff to do so, Plaintiff refused.

**G.      Plaintiff Reports Numerous Safety Violations to OSHA and if Terminated Eight Days Later**

38.      Seeing that the safety issues that Plaintiff had highlighted to Defendant were being ignored and fearing that the life and safety Plaintiff and Plaintiff's co-workers were in serious danger, Plaintiff engaged in "Protected Activity" by providing Pipeline Safety Information to OSHA on August 19, 2021. Plaintiff initially reported the following items to OSHA:

1. Not following the current Enterprise COVID-19 safety policy nor state mandates that may in place.
2. Safety concerns with to utilizing barricades during nitrogen purges of fixed equipment.
3. Safety concerns with unsafe scaffolding, and having non-concerned personal in leadership, that can override safety concerns and overlook stop work authority.
4. Safety concerns with no utilization of air movers and proper venation in confined spaces and having non-concerned personal in leadership, that can override safety concerns and overlook stop work authority.

39.     These complaints were filed with OSHA, as well as Texas and New Mexico state authorities on or about August 19, 2021.

40.     In following up with OSHA investigators, Plaintiff also informed OSHA of the issues related to seismic damage to Defendant 's pipeline facilities in and around Orla, Texas, including the matters contained within this Complaint.

41.     On August 20, 2021, Plaintiff informed Defendant that he had contacted OSHA regarding numerous safety violations during a scheduled turnaround project based on internal compliance inspections and mole serve replacement. Defendant was further aware of the OSHA complaints based on information provided in emails and/or other communications.

42.     Despite the fact that Berry had previously apologized for his conduct in physically threatening and verbally assaulting Plaintiff, Berry and certain co-workers determined to see Plaintiff terminated so that they and Defendant would not be restricted by federal safety laws, determined to engage in conduct that resulted in Plaintiff's termination. Specifically, despite the fact that altercation was started and predicated by Berry and that the Plaintiff did nothing but engaged in self-defense, Berry has falsely reported and maintained that Plaintiff engaged in hostile conduct and threatened Berry. This is a false pretext.

43.     Worse, Berry has used his authority over his co-workers to silence any attempt at the truth of the matter. At this point, Plaintiff is not aware as to how high in Defendant 's organization the coordinated activity goes. However, Berry and those acting in coordination with or in fear of Berry have acted as Cat's Paws that have engineered Plaintiff's termination under knowingly false pretenses.

44.     Plaintiff was terminated by Defendant on August 27, 2021. Defendant gave Plaintiff no reason for his termination.

45.     Defendant terminated Plaintiff just seven days after being informed that Plaintiff had notified OSHA of Defendant's Pipeline Safety violations and within a few weeks of refusing to engage in illegal activity or falsifying pipeline mechanical integrity PSM compliance reports/safety data.

46.     Plaintiff was terminated because he engaged in Protected Activity. That is, Plaintiff's Protected Activity was a contributing factor to Defendant terminating Plaintiff's employment without regarding to there being potentially more than one reason for Plaintiff's termination.

47.     Plaintiff has been injured by Defendant's violation of the PSIA through loss of wages and benefits in the past and in the future; loss of earning capacity; mental anguish and loss of enjoyment of life, including through stress on Plaintiff's family life; the requirement to engage an attorney and file this matter, and the costs of experts and of litigation that will be required to successfully prosecute this matter.

**H.     Defendant Falsifies OSHA Response, Blacklists, and Harasses Plaintiff**

48.     In responding to OSHA's safety investigation, Defendant denied that their pipelines had any reported issues related to seismic activity. This report was false. Indeed, not only was Defendant's management aware of the Orla tower leans, but testing conducted after Plaintiff's initial report by a third-party inspection company determined over 150 weld failures during inspections of approximately 300 welds in the Orla facility. Per ASME requirements, these inspections reports must be maintained by the inspectors for 60 months.

49.     After his termination, Plaintiff has been harassed and blacklisted by Defendant. Given that Defendant owns approximately 50% of the pipelines in the Permian Basin, Defendant's conduct effectively prevented Plaintiff from obtaining gainful employment in his

specialty field of pipeline inspecting for an unnecessarily prolonged timeframe. Further, Plaintiff

has been harassed in public places by the area Regional Manager Darrell Arrandondo and

Superintend Zack Berry along with a handful of former co-workers (under video surveillance),

and he has even had to file a police report to free himself of such harassment.

50. **LEGAL GROUNDS**

    51.    Pursuant to the PSIA's whistleblower provisions, an employer may not

terminate the employment of an employee because he or she engages in Protected Activity.

Specifically:

---

**42 U.S.C. §60129.**

**Protection of employees providing pipeline safety information.**

(a) DISCRIMINATION AGAINST EMPLOYEE

  (1) IN GENERAL- No employer may discharge any employee or otherwise discriminate against any current or former employee with respect to his compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee)

    (A) provided, caused to be provided, or is about to provide or cause to be provided, to the employer or the Federal Government information relating to any violation or alleged violation of any order, regulation, or standard under this chapter or any other Federal law relating to pipeline safety;

    (B) refused to engage in any practice made unlawful by this chapter or any other Federal law relating to pipeline safety, if the employee has identified the alleged illegality to the employer;

---

    52.    Despite Section 60129 (a)'s prohibitions, Defendant terminated Plaintiff because

of his Protected Activity, which under the PSIA is defined as the Protected Activity being a

contributing cause to Plaintiff's termination.

53.     Pursuant to the PSIA, the federal court possesses authority to issue relief that

could have been imposed by the Secretary of Labor, including:

> (B) REMEDY- If, in response to a complaint filed under paragraph (1), the Secretary of Labor determines that a violation of subsection (a) has occurred, the Secretary of Labor shall order the person or persons who committed such violation to
>
> (i) take affirmative action to abate the violation;
>
> (ii) reinstate the Plaintiff to his or her former position together with the compensation (including back pay) and restore the terms, conditions, and privileges associated with his or her employment; and
>
> (iii) provide compensatory damages to the Plaintiff. If such an order is issued under this paragraph, the Secretary of Labor, at the request of the Plaintiff, shall assess against the person or persons against whom the order is issued a sum equal to the aggregate amount of all costs and expenses (including attorney's and expert witness fees) reasonably incurred, as determined by the Secretary of Labor, by the Plaintiff for, or in connection with, the bringing the complaint upon which the order was issued.
>
> 42 U.S.C. §60129 (b) (3) (B).

54.     Cat's Paw theory applies to this case and imputes the animus of Defendant's

managers to Defendant's decision even if the decision was made by an allegedly untainted

individual. In *Staub v. Proctor Hospital,* 562 U.S. 411, 131 S.Ct. 1186 (2011), the Supreme

Court determined that an employer should be held liable for employment discrimination based

on the discriminatory animus of an employee, who influenced, but did not make, the ultimate

employment decision. This doctrine is commonly referred to as "Cat's Paw." In *Staub v. Proctor*

*Hospital,* 562 U.S. 411, 131 S.Ct. 1186 (2011), the Supreme Court determined that an employer

should be held liable for employment discrimination based on the discriminatory animus of an

employee, who influenced, but did not make, the ultimate employment decision.

55.     Under the Cat's Paw analysis, "the impermissible bias of a single individual at

any stage of the promoting process may taint the ultimate employment decision ... so long as the

individual shown to have the impermissible bias played a meaningful role" in the employment action. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999). *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999). Cat's Paw theory applies to employment rights claims within the Fifth Circuit as evidenced in *Zamora v. City of Houston*, 798 F.3d 326, 331-32 (5th Cir. 2015) (holding cat's paw analysis applies in Fifth Circuit to Title VII cases). Cat's Paw theory has also been applied to whistleblower cases by federal courts. *See Chavez-Lavagnino v. Motivation Education Training, Inc.*, 767 F.3d 744, 750 (8th Cir. 2014) (Minnesota Whistleblower Act).

56. Given the paucity of PSIA cases, Plaintiff can find no PSIA cases in Westlaw searches where Cat's Paw theory has been asserted – much less ruled upon by a federal court or the ARB or OALJ judge.

57. Under federal employment laws, post-employment discrimination and retaliation is prohibited under the laws protecting the initial discrimination or retaliation if the misconduct is a continuation of the prior misconduct or injures the employee's chances for re-employment. *See e.g., Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (post-employment discrimination prohibited by Title VII); *Passer v. American Chem. Soc'y,* 935 F.2d 322, 331 (D.C.Cir.1991) (ADEA case); *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 157 (3rd Cir.1999) (post-employment actions by an employer can constitute discrimination under Title VII if they hurt a plaintiff's employment prospects); *Sherman v. Burke Contracting, Inc.,* 891 F.2d 1527 (11th Cir.1990) (alleging former employer persuaded current employer to discharge employee for employee's participation in charge against former employer); *Rutherford v. American Bank of Commerce,* 565 F.2d 1162 (10th Cir.1977) (retaliation in the form of advising prospective employer that plaintiff had filed sex discrimination charges).

58.    Federal cases have also applied the rule to hold that federal employment laws protect from post-employment harassment by the employer related to protected activity or status (*see, e.g., Reed v. Shepard,* 939 F.2d 484 (7th Cir.1991) (retaliatory measures included assault, phone threats, and shooting at plaintiff's vehicle)), and suspension or termination of benefits over which the former employer has direct control. *(see, e.g., EEOC v. Cosmair, Inc.,* 821 F.2d 1085 (5th Cir.1987) (employer discontinued severance pay after former employee filed charges); see also, *Fields v. Phillips School of Business and Technology,* 870 F.Supp. 149, 153 (W.D. Tex.1994). ("a plaintiff may file a Title VII retaliation action against a previous employer for retaliatory conduct occurring after the end of the employment relationship when the retaliatory act is in reprisal for a protected act within the meaning of 42 U.S.C. § 2000e–3(a) and arises out of or in relation to the employment relationship...." )).

59.    To the extent that the Defendant alleges the Plaintiff's termination was caused by a violation of its anti-workplace violence policy, this excuse is a false pretext for retaliation and is not otherwise permitted as a legal ground for termination under prior whistleblower case precedence.

60.    Indeed, not only will this tribunal find the allegations that Plaintiff allegedly threatened violence against his supervisor false, to the extent that the tribunal may find Plaintiff's response to Berry's threats of violence against Plaintiff were less than perfect, even assuming arguendo that any such imperfection is found, such a response when threatened with violence for engaging in protected activity would be protected by the PSIA and Whistleblower case law. Indeed, such guidance shows that an employee need not respond with the patience of Job or angelic perfection when given the unlawful instruction to violate safety laws to the risk of themselves or others.

61.     *For example, w*here a Plaintiff was provoked by the supervisor's unlawful interference in the Plaintiff's protected activity and challenged his supervisor to a fight, the Defendant could not rely on such a challenge to terminate the Plaintiff's employment as a basis for lawful termination when the Plaintiff's conduct was spontaneous and far from egregious, given that no blows were actually struck. *See Moravec v. HC & M Transportation, Inc.,* 90-STA-44 (Sec'y Jan. 6, 1992), *citing Monteer v. Milkway Way Transport Company Inc.,* 90-STA-9 (Sec'y Jan. 4, 1991) (order denying reconsideration), slip op. at 3 ("An employer may not provoke an employee to the point of committing an indiscretion and then seize on the incident as a legitimate rationale for discharge."); *see also, N.L.R.B. v. M & B Headwear Co.,* 349 F.2d 170 (4th Cir. 1965) (an employer cannot provoke an employee to the point where she commits an indiscretion and then rely on the provoked-indiscretion to terminate her employment); *N.L.R.B. v. Miller Redwood Company,* 407 F.2d 1336, 1370 n.2 (9th Cir. 1989) (although this rule is not applied in cases of extremely egregious conduct by the employee, an employee's threat to beat up the supervisor was not sufficiently egregious in that case); and *N.L.R.B. v. Mueller Brass Co.,* 501 F.2d 680, 685-6 (5th Cir. 1974) (employee's abusive conduct of calling his supervisor a "damn liar" and inviting him to "settle matters outside" did not justify his discharge because the employee's outburst was spontaneous and provoked by employer's unlawful conduct).

## IV.     REQUESTED RELIEF

### Count One - <u>Wrongful Termination in Violation of the Whistleblower Anti-Retaliation Provisions of the Pipeline Safety Improvement Act</u>

62.     For his Count One, Plaintiff respectfully requests that after a hearing on the merits, that this tribunal issue an order and findings in favor of Plaintiff as follows:

  a.  That Defendant wrongfully terminated Plaintiff in violation of the PSIA's whistleblower provisions because of Plaintiff's Protected Activity, including a

finding that Plaintiff's Protected Activity was a contributing factor to Defendant's decision to terminate Plaintiff's employment.

b. That as a result of Defendant's wrongful termination of the Plaintiff in violation of the PSIA, Plaintiff has suffered and will continue to suffer harm, including compensatory and lost wages in the past and in the future, mental anguish, and loss of enjoyment of life, attorney fees, expert fees, cost of court, pre- and post-judgment interests, and any other relief in law or equity that the Tribunal deems just and right.

**Count Two - <u>Post-Termination Retaliation in Violation of the Whistleblower Anti-Retaliation Provisions of the Pipeline Safety Improvement Act</u>**

63.     For his Count Two, Plaintiff respectfully requests that after a hearing on the merits, that this tribunal issue an order and findings in favor of Plaintiff as follows:

a. That after wrongfully terminating Plaintiff, Defendant and its agents have continued a pattern and practice of discriminating against Plaintiff in violation of the PSIA's whistleblower provisions because of Plaintiff's Protected Activity, including blacklisting Plaintiff and harassing him while he is in public, and including a finding that Plaintiff's Protected Activity was a contributing factor to Defendant's actions in blacklisting and decision to terminate Plaintiff's employment.

b. That as a result of Defendant's post-termination discrimination and harassment of the Plaintiff in violation of the PSIA, Plaintiff has suffered and will continue to suffer harm, including compensatory and lost wages in the past and in the future, mental anguish and loss of enjoyment of life, attorney fees, expert fees, cost of

court, pre- and post-judgment interests, and any other relief in law or equity that the Tribunal deems just and right.

**IV.    JURY DEMAND AND REQUEST**

Plaintiff respectfully demands a trial by jury on all issues of law so triable under the laws and Constitution of the United States; and to the extent allowable thereby, Plaintiff respectfully requests the submission to the jury of advisory questions on all issues of equity as the Court deems advisable or will allow.

**IV.    PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Tribunal enter an opinion and order in favor of Plaintiff and against Defendant and award the following relief:

a.    Back pay and loss of benefits in the past, understood to be legal damages, in an amount to be determined at trial by the jury;

b.    Reinstatement of employment, or in the event reinstatement is not granted under the Court's equitable powers as unfeasible under the circumstances, an award under the equitable remedy of front pay and/or loss of benefits in the future;

c.    Compensatory damages, including for emotional distress, mental anguish, embarrassment, and loss of enjoyment of life; attorney fees; expert fees; and costs of this action;

d.    Pre-judgment and post-judgment interest at the highest lawful rate; and

e.    Any such further relief in law or in equity as the Tribunal deems just and right.

Respectfully submitted,

*/s/ Eric N. Roberson*

Eric Roberson

Texas State Bar No. 00792803
ENR@Kilgorelaw.com
Kilgore & Kilgore, PLLC
3141 Hood Street, Suite 500
Dallas, TX 75219
214-379-0817 Direct
214.969.9099 Switchboard
214.379.0843 Fax
**COUNSEL FOR PLAINTIFF**
**KEVIN HUDGENS**

## CERTIFICATE OF SERVICE

The undersigned certifies that this pleading will be served on Defense Counsel, Joe

Ahmad, Esq. via email.

*/s/ Eric N. Roberson*

Eric N. Roberson